# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
**VERN McKINLEY,**                       )
                                         )
           **Plaintiff,**                )
                                         )
           **v.**                        )        **Civil Action No. 09-1263 (ESH)**
                                         )
**FEDERAL DEPOSIT INSURANCE**            )
**CORPORATION**                          )
                                         )
           **and**                       )
                                         )
**BOARD OF GOVERNORS OF THE**            )
**FEDERAL RESERVE SYSTEM,**              )
                                         )
           **Defendants.**               )
_____)


## MEMORANDUM OPINION

Plaintiff Vern McKinley brings this action against the Board of Governors of the Federal

Reserve System ("Board") pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. §

552 *et seq.*[1] Plaintiff seeks access to documents related to the Board's March 14, 2008 decision

to authorize the Federal Reserve Bank of New York ("FRBNY") to extend credit to JP Morgan

Chase to provide temporary emergency financing to The Bear Stearns Companies Inc. ("Bear

Stearns"). In response to plaintiff's FOIA request, the Board produced a number of documents,

but withheld or redacted others pursuant to FOIA Exemptions 4, 5, and 8. 5 U.S.C. §

552(b)(4)(5) & (8). Before the Court are the parties' cross-motions for summary judgment. For

---

[1] The complaint previously included FOIA claims against the Federal Deposit Insurance
Corporation ("FDIC"). (Complaint, July 8, 2009 [dkt. #1].) However, after the withheld
material was publicly released, the pending motions pertaining to those FOIA claims were
denied as moot and the FDIC was dismissed as a defendant. (Minute Order, Sept. 3, 2010.)

the reasons stated herein, the Court will grant the Board's motion for summary judgment and deny plaintiff's motion.

## BACKGROUND

The Federal Reserve System is composed of the Board and twelve regional Federal Reserve Banks. The Board is a federal agency composed of seven members appointed by the President and confirmed by the Senate. (Pl.'s Statement of Material Facts ("Pl.'s Statement") ¶ 2 (Mar. 8. 2010); Def.'s Resp. to Pl.'s Statement ("Def.'s Resp.") at 2 (Apr. 22, 2010).) It supervises and regulates the operation of the Federal Reserve System, promulgates and administers regulations, and plays a major role in the supervision and regulation of the United States banking system. (Pl.'s Statement ¶ 3; Def.'s Resp. at 2.) For example, the Board is "authorized and empowered . . . (1) [t]o examine at its discretion the accounts, books, and affairs of each Federal reserve bank and of each member bank and to require such statements and reports as it may deem necessary" and "(2) [t]o require any depository institution specified in this paragraph to make, at such intervals as the Board may prescribe, such reports of its liabilities and assets as the Board may determine to be necessary or desirable to enable the Board to discharge its responsibility to monitor and control monetary and credit aggregates." 12 U.S.C. § 248. It is not, however, authorized to extend credit. (Pl's Statement ¶ 14; Def.'s Resp. at 4.)

The twelve regional Federal Reserve Banks serve as the operational arm of the nation's central banking system. (Pl.'s Statement ¶ 2; Def.'s Resp. at 2.) They receive no appropriated funds from Congress, but rather are capitalized by required contributions from member banks. (Pl.'s Statement ¶ 11; Def.'s Resp. at 4.) Each bank is a separate corporation that issues stock held by depository institutions within its district; each has its own 9-member

board of directors, six of whom are elected by member banks within the district, and three of whom are appointed by the Board; and each acts as a depository for banks within its district, a lender to eligible institutions through its "discount window," a clearing agent for checks, and fulfills other responsibilities for banks within the district. (Pl.'s Statement ¶¶ 6, 8, 9; Def.'s Resp. at 3.) The regional banks, unlike the Board, are authorized to extend credit. (Pl.'s Statement ¶ 14; Def.'s Resp. at 4.)

In early March 2008, the Board became aware of potential liquidity problems at Bear Stearns, a holding company comprised of a number of different financial instiutions. (Decl. of Coryann Stefansson ("Stefansson Decl.") ¶ 7; Decl. of Margaret Celia Winter ("Winter Decl.") ¶ 11.) On Thursday, March 13, 2008, Bear Stearns' liquidity declined to levels that were inadequate to cover its maturing obligations. (Stefansson Decl. ¶ 7.) That evening, the United States Securities and Exchange Commission ("SEC") notified both the Board and the FRBNY, one of the twelve regional banks, that as things stood Bear Stearns "would have to file for bankruptcy protection the next day." (*Id.*) "In response to the rapidly evolving crisis, Board staff and staff of the FRBNY began collecting and sharing real-time data on the exposure of various financial institutions to Bear Stearns, as well as other information and analyses, to assess the gravity of Bear Stearns' situation, the possible impact of a Bear Stearns bankruptcy on financial institutions and markets, and the Board's possible policy responses." (Def.'s Statement of Material Facts ("Def.'s Statement") ¶ 9 (Feb. 1, 2010 (citing Stefansson Decl. ¶¶ 7-10).) Among other actions, the Board surveyed the Large Complex Banking Institutions (LCBOs) under its supervision to assess their exposure to Bear Stearns. (Stefansson Decl. ¶ 8.) The information gathered was disseminated and discussed among Board members and other Federal

Reserve staff.  (*Id.* ¶ 9.)

Ultimately, the Board concluded that "a sudden disorderly failure of Bear Stearns would have had unpredictable, but severe, consequences on the functioning of financial markets." (*Id.* ¶¶ 9,10.)  However, "[b]ecause Bear Stearns was not a depository institution, it was not eligible to obtain financing directly from the FRBNY's discount window." (*Id.* ¶ 7.)  Citing these "unusual and exigent circumstances" and its authority under section 13(3) of the Federal Reserve Act (Decl. of Alison Thro ("Thro Decl."), Ex. A, at 3), the Board agreed, as reflected in the minutes of its meeting on the morning of March 14, 2008, "that, given the fragile condition of the financial markets at the time, the prominent position of Bear Stearns in those markets, and the expected contagion that would result from the immediate failure of Bear Stearns, the best alternative available was to provide temporary emergency financing to Bear Stearns through an arrangement with JPMorgan Chase & Co." (*Id.*; Stefansson Decl. ¶ 10.)  Specifically, the Board authorized the FRBNY to extend credit to JP Morgan Chase to provide a temporary loan to Bear Stearns to enable it to meet its financial obligations and to avoid filing for bankruptcy.  (Thro Decl., Ex. A.).  The FRBNY decided to extend the loan, and Bear Stearns did not file for bankruptcy.[2]

On December 17, 2008, plaintiff submitted the following FOIA request to the Board:

I am requesting further detail on information contained in the following minutes of the Board of Governors of the Federal Reserve dated March 14, 2008:

http://www.federalreserve.gov/newsevents/press/other/other20080627a1.pdf

The source of this power is Section 13(3) of the Federal Reserve Act.  In

---

[2]On March 16, 2008, the Board authorized the FRBNY to extend a second loan to JP Morgan Chase in connection with its acquisition of Bear Stearns.  (Thro Decl. ¶ 3.)

particular, I am requesting any supporting memos or other information that detail the 'expected contagion that would result from the immediate failure of Bear Stearns' and the related conclusion that 'this action was necessary to prevent, correct, or mitigate serious harm to the economy or financial stability' as described in the meeting minutes.

(*Id.*)

In responding to plaintiff's request, Board staff reviewed "a document repository containing over 28,000 pages of information." (*Id.* ¶¶ 4, 5.) On August 11, 2009, the Board produced 120 pages of previously released or publicly available documents. (*Id.* ¶ 9 & Ex. D.) On September 30, 2009, the Board identified an additional 238 pages of responsive documents. (*Id.* ¶10.) From this universe, the Board produced 48 pages in full, produced 27 pages with information redacted, and withheld 163 pages in full, including 8 pages containing information about the financial condition of Bear Stearns that had originated with the SEC, which the Board referred to the SEC for final disposition.[3] (*Id.*) The Board based its withholdings and redactions on FOIA Exemptions 4, 5, 6, and 8. (*Id.*) On January 7, 2010, the SEC informed plaintiff that it considered the documents referred to it by the Board protected from disclosure under FOIA Exemptions 5 and/or 8. (Winter Decl. ¶ 5.) The Board has produced a *Vaughn* Index, identifying the withheld material by "Item" number (1-38), "Bates" number(s), physical location on the page (where necessary), a description of the withheld material, and the "basis for withholding." (Thro Decl., Ex. F ("*Vaughn* Index").)[4]

Defendant has moved for summary judgment, contending that its application of FOIA

---

[3]The documents produced in full have Bates numbers ending in 02-03, 06, 10, 14-16, 18-19, 24-28, 36-37, 40, 42, 45-50 and 215-238; the withheld and redacted pages have Bates numbers ending in 01, 04-05, 07-09, 11-13, 17, 20-23, 29-35, 38-39, 41, 43-44, 51-214.

[4]A single Item number may include multiple pages or a single redaction on a page.

exemptions was proper.  (Def.'s Mot. for Summ. J., Feb. 1, 2010).  Its motion is supported by

declarations from Alison M. Thro, Senior Counsel in the Board's Legal Division, Coryann

Stefannson, Associate Director of the Board's Division of Banking Supervision and Regulation,

Margaret Celia Winter, Freedom of Information Act and Privacy Act Officer at the SEC, and

Michelle A. Danis, senior financial economist in the Broker-Dealer Risk Office of the SEC

Division of Trading and Markets ("Danis Decl.").  (*Id.*; Def.'s Opp'n & Reply, Apr. 22, 2010.)

Plaintiff does not dispute defendant's application of FOIA Exemption 6 (Item #'s 2, 3, 19, 25,

and 28), but challenges the applicability of FOIA Exemptions 4, 5 and/or 8 (Item #'s: 1, 4-22,

24, 26-27, 29-38),[5] and cross-moves for summary judgment.[6]  (Pl.'s Cross-Mot. for Summ. J.,

Mar. 8, 2010).

## ANALYSIS

### I.    STANDARD OF REVIEW

The Court may grant a motion for summary judgment "if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c).  The moving party bears the burden of demonstrating an absence of a genuine issue of

material fact in dispute.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Factual assertions

---

[5]On January 28, 2010, after initially withholding it, the Board produced Item #23 (Bates # 0046).  (Thro Decl. ¶ 11.)

[6]Plaintiff's response to defendant's Statement of Material Facts states that he "disputes that the Board has satisfied its burden of demonstrating that it conducted an adequate search." (Pl. Statement of Material Facts ¶ 3.)  However, plaintiff fails to support this statement with any legal argument, so the Court need not consider the adequacy of the search.

in the moving party's affidavits may be accepted as true unless the opposing party submits his own affidavits or declarations or documentary evidence to the contrary. *Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992).

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (citations omitted). "In a FOIA case, summary judgment may be granted to the government if 'the agency proves that it has fully discharged its obligations under the FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester.'" *Fischer v. U.S, Dep't of Justice*, 596 F. Supp. 2d 34, 42 (D.D.C. 2009) (quoting *Greenberg v. U.S. Dep't of Treasury*, 10 F. Supp. 2d 3, 11 (D.D.C. 1998))). "An agency that has withheld responsive documents pursuant to a FOIA exemption can carry its burden to prove the applicability of the claimed exemption by affidavit." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (citing *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 926 (D.C. Cir. 2003)). "Summary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Id.* (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)); *see also Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir.1981); *Larson*, 565 F.3d at 862.[7]

---

[7]FOIA provides district courts the option to conduct in camera review, 5 U.S.C. § 552(a)(4)(B), but "it by no means compels the exercise of that option." *Larson*, 565 F.3d at 862 (internal citations and quotations omitted). To the contrary, although district courts possess broad discretion regarding whether to conduct in camera review, "[w]hen the agency meets its burden by means of affidavits, in camera review is neither necessary nor appropriate." *Id.*

"FOIA represents a balance struck by Congress between the public's right to know and the government's legitimate interest in keeping certain information confidential." *Ctr. for Nat'l Security Studies*, 331 F.3d at 925 (citing *John Doe Agency*, 493 U.S. at 152). "While these exemptions are to be 'narrowly construed,' *FBI v. Abramson*, 456 U.S. 615, 630, courts must not fail to give them 'a meaningful reach and application,' *John Doe Agency*, 493 U.S. at 152." *Id.* Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Larson*, 565 F.3d at 862 (quoting *Wolf v. CIA*, 473 F.3d 370, 374-75 (D.C. Cir. 2007)).

## II.     FOIA Exemption 5

FOIA Exemption 5 allows an agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552 (b)(5). "To qualify, a document must thus satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standard that would govern litigation against the agency that holds it." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001); *see EPA v. Mink*, 410 U.S. 73 (1973); *NLRB v. Sears*, 421 U.S. 132, 148 (1975). Among the privileges incorporated by FOIA Exemption 5 are the "deliberative process" privilege and the "attorney work product" privilege. *Klamath*, 532 U.S. at 8; *see Loving v. Dep't of Defense*, 550 F.3d 32, 37 (D.C. Cir. 2008); *Baker & Hostetler LLP v. Dep't of Commerce*, 473 F.3d 312, 321 (D.C. Cir. 2006)). The Board claims that Exemption 5 protects from disclosure all of the material plaintiff seeks (Item #'s 1, 4-22, 24, 26-27, 29-38). Plaintiff challenges the Board's reliance on Exemption 5 on several grounds, each of which is addressed below.

## A.       Inter-Agency/Intra-Agency Communications

Plaintiff argues that Item #'s 1, 4-6, 10-12, 14, 20-21, 26-27, 29-34, 36, 37, and 38 are

not "inter-agency" or "intra-agency" communications because they are "records and information

exchanged by officials of the Board and employees of the FRBNY"  or "records or information

exchanged between the SEC and the FRBNY" and the FBRNY is not a government agency.  (Pl.

Mem. at 27.)  The Board concedes that FRBNY is not a government agency, but argues that

Exemption 5 applies nonetheless under the "consultant corollary," pursuant to which

"intra-agency" and "inter-agency" communications include "agency records containing

comments solicited from non-governmental parties . . . whose counsel [an agency] sought."

*Nat'l Institute of Military Justice v. U.S. Dep't of Defense*, 512 F.3d 677, 680 (D.C. Cir. 2008);

*see also Ryan v. Dep't of Justice*, 617 F.2d 781, 790 (D.C. Cir. 1980) ("When an agency record

is submitted by outside consultants as part of the deliberative process, and it was solicited by the

agency, we find it entirely reasonable to deem the resulting document to be an 'intra-agency'

memorandum for purposes of determining the applicability of Exemption 5."); *Judicial Watch,*

*Inc. v. Dep't of Energy*, 412 F.3d 125, 129 (D.C. Cir. 2005) (documents prepared by

presidentially-established policy group and held by eight different federal agencies were

nonetheless "intra-agency" records because group was created solely to advise the President).

Plaintiff does not dispute the existence of a "consultant corollary," but argues that

defendant has not demonstrated that the records at issue were "created at the request of the

agency [the Board] and 'for the purpose of aiding the agency's deliberative process.'"  (Pl.'s

Reply at (quoting *Nat'l Institute of Military Justice*, 512 F.3d at 681).)  Plaintiff argues that the

Board has failed to make the necessary showing because "[n]owhere does the Board assert that it

asked the FRBNY to gather and discuss data with the Board" and "the Board [does not] assert that the FRBNY gathered data for the purpose of aiding the Board's deliberative process." (Pl. Reply at 11-12.) Plaintiff's argument conveniently overlooks the Stefansson Declaration, which includes those precise assertions. (Stefansson Decl. ¶ 8.) For example, in her declaration, Stefansson, an Associate Director in the Board's Division of Banking Supervision and Regulation and a participant in the March 13-14, 2008 events, states that:

> Board members and Board staff were concerned about the effects a Bear Stearns bankruptcy would have on financial markets given the prominent position of Bear Stearns in those markets. We were also concerned about the impact a Bear Stearns bankruptcy filing would have on individual LCBOs [large complex banking organizations] and smaller institutions supervised by the Board and other financial entities not supervised by the Board. As a result, in accordance with well-established supervisory processes, Board and Reserve Bank staff responsible for LCBO supervision surveyed the LCBOs for purposes of assessing LCBOs' real-time exposure to Bear Stearns. This action was taken as part of the Board's consideration of potential responses to Bear Stearns' funding difficulties.

(Stefansson Decl. ¶ 8.) This statement more than satisfies defendant's burden to show that the records and information exchanged by the Board and the FBRNY were "documents . . . submitted by non-parties in response to an agency's request for advice." *Nat'l Institute of Military Justice*, 512 F.3d at 681; *see also Formaldehyde Inst. v. Dep't of Health & Human Servs.*, 889 F.2d 1118 , 1123 (D.C. Cir. 1989) ("Whether the author is a regular agency employee or a temporary consultant is irrelevant; the pertinent element is the role, if any, that the document plays in the process of agency deliberations." (internal quotations omitted)).

Plaintiff also suggests that the consultant corollary cannot apply here because the FBRNY's interests "are not identical to the Board." According to plaintiff, the FRBNY's interests diverge from the Board's interests because "in enacting Section 13(3) of the Federal Reserve Act, Congress gave the Board the power to authorize Federal Reserve Banks, such as

the FRBNY, to extend loans to non-banks in 'unusual and exigent circumstances,' but it gave the Federal Reserve Banks the final say as to whether to actually extend such loans." (Pl's Mem. at 4.) Moreover, "[b]efore the loan could be extended, the FRBNY was required by law to make its own finding, specifically, that the recipient of the prospective loan 'is unable to secure adequate credit accommodations from other banking institutions.'" (*Id.* (quoting 12 U.S.C. § 343).) Thus, plaintiff concludes, "[t]he FRBNY's role . . . is fundamentally different from that of an outside consultant. The FRBNY, as a private corporation engaged in the business of banking, has its own interests and obligations in the commercial activity of extending loans." (Pl's Mem. at 3-4.)

Accepting plaintiff's description as accurate, it does not necessarily follow, as plaintiff asserts, that "it is likely that the FRBNY gathered data in furtherance of its own interests: to determine whether it would extend an emergency loan to Bear Stearns." Pl. Reply at 12.) More importantly, the critical inquiry is not whether FRBNY's interests were at all times identical to the Board's, but rather whether the FRBNY "d[id] not represent an interest of its own, or the interest of any other client, when it advise[d] the [Board]," such that its "only obligations are to truth and its sense of what good judgment calls for, and in those respects the consultant functions just as an employee would be expected to do." *Klamath*, 532 U.S. at 10-11. Under those circumstances, records submitted by an outside consultant "'play[] essentially the same part in an agency's process of deliberation as documents prepared by agency personnel might have done,' notwithstanding the consultants 'were independent contractors and were not assumed to be subject to the degree of control that agency employment could have entailed' and they were not necessarily 'devoid of a definite point of view.'" *Nat'l Institute of Military Justice*, 512 F.3d at 682 (quoting *Klamath*, 532 U.S. at 10). Here, the declarations and the documents adequately

establish that the FRBNY was not representing an interest of its own when it advised the Board, but rather it was simply assisting the Board's evaluation of the Bear Stearns situation. (*See*, *e.g.*, Stefansson Decl. ¶ 7 ("SEC notified the Board and the Federal Reserve Bank of New York . . . that Bear Stearns funding resources were inadequate to meet its obligations"); *id*. ¶ 8 ("in accordance with well-established supervisory processes, Board and Reserve Bank staff responsible for LCBO supervision surveyed the LCBOs for purposes of assessing the LCBOs' real-time exposure to Bear Stearns"); *Vaughn* Index at 2 (Item #1) (e-mail conveyed information re supervised institutions exposure to Bear Stearns); *Vaughn* Index at 5 (Item #4) (same); *Vaughn* Index at 7 (Item #6) (e-mail conveying information re supervised institutions' attempts to limit exposure to Bear Stearns).

Accordingly, the Court concludes that Item #'s 1, 4-6, 10-12, 14, 20-21, 26-27, 29-34, 36, 37, and 38 are inter or intra-agency documents within the meaning of Exemption 5.

**B.      Applicability of Deliberative Process Privilege**

With one exception, *see infra* § II.C, all of the Board's Exemption 5 claims rest on the deliberative process privilege. The deliberative process privilege "covers 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Klamath*, 532 U.S. at 8 (quoting *NLRB v. Sears*, 421 U.S. at 150.) The privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance 'the quality of agency decisions.'" *Id.* (quoting *NLRB v. Sears*, 421 U.S. at 151.); *see Mead Data Cent. v. Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 256 (D.C. Cir. 1977) (purpose is to protect the "quality of administrative

decision-making [which] would be seriously undermined if agencies were forced to 'operate in a fishbowl' because the full and frank exchange of ideas on legal or policy matters would be impossible"); *Dudman Commc'n Corp. v. Dep't of the Air Force,* 815 F.2d 1565, 1568 (D.C. Cir.1987) (privilege "rests most fundamentally on the belief that were agencies forced to 'operate in a fishbowl,' the frank exchange of ideas and opinions would cease and the quality of administrative decisions would consequently suffer").

For the deliberative process privilege to apply, the material must be both "predecisional" and "deliberative." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997); *Loving v. Dep't of Defense*, 550 F.3d 32, 38 (D.C. Cir. 2008). A document is predecisional if it is "generated before the adoption of an agency policy." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir.1980). To demonstrate that a document is predecisional, the burden is on the agency to "establish[ ] what deliberative process is involved, and the role played by the documents in issue in the course of that process." *Id.* at 868. A document is deliberative if it "reflects the give-and-take of the consultative process." *Id.* at 866. The deliberative process privilege generally does not cover the purely factual portions of documents, except in cases where the factual material "is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations*." In re Sealed Case*, 121 F.3d at 737; *Quarles v. Dep't of the Navy*, 893 F.2d 390, 392 (D.C. Cir. 1990) ("disclosure of certain factual information can "expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions"); *Dudman,* 815 F.2d at 1568.

Plaintiff challenges the Board's invocation of the deliberative process privilege on two

grounds: (1) that the Board improperly withheld purely factual information; and (2) the Board

fails to show that release of the withheld material will cause "harm" to the deliberative process.[8]

### 1. Factual Information

The Board states up front that it has withheld "certain factual material that is itself

deliberative." (Mem. in Support of Def.'s Mot. for Summ. J. at 15.) Plaintiff challenges this

claim on the ground that the Board "has not demonstrated that disclosure of the factual material

at issue -- financial statistics, pricing and exposure data, and the identities of various financial

institutions -- by itself will reveal any deliberations or judgment calls by Board officials in

deciding to authorize an emergency loan to Bear Stearns." (Pl. Mem. & Opp'n at 29.) Plaintiff

directs the Court's attention to three examples of what he considers improperly withheld factual

---

[8]At one point plaintiff also asserts that "the deliberative process privilege is a "qualified
privilege and can be overcome by a sufficient showing of need." (Pl.'s Mem. & Opp'n at 28
(quoting *In re Sealed Case*, 121 F.3d at 737).) However, it is well-established that "[a] court's
decision in a discovery case may rest in part on an assessment of the particularized need of the
party seeking discovery, but in a FOIA suit, the court does not consider the needs of the
requestor." *See EPA v. Mink*, 410 U.S. at 86.

information (Items 13[9], 16[10], and 20[11]).[12]  Plaintiff argues that "[i]f anything, the factual data the

Board seeks to withhold from Plaintiff reflects a frantic scramble on the evening of March 13,

2008 and in the early morning of March 14, 2008 to gather as much raw data as possible, not any

careful or considered culling of facts that would reveal the exercise of agency judgment."  (Pl.

Mem. & Opp'n at 30.)

The Board responds that plaintiff "fails to perceive that the very act of the Board (or in

certain cases, the Securities & Exchange Commission) reaching out to request specific financial

information from specific institutions was itself a part of the deliberative process."  (Board

Opp'n & Reply at 2.)  As an example, the Board points to Item 8, from which the Board

withheld "the identities of two financial firms and one regulated financial institution" because

---

[9]Item 13 is an email from a Board analyst on March 13, 2008, at 5:40 p.m. that states, "Here are exposures to [Bear Stearns] that I have now."  The *Vaughn* index describes the withheld material as "Identification of LFIs and the nature and scope of their exposure to BS."

[10]Item No. 16 is an email from a Board official on March 13, 2008, at 10:18 p.m. that states, "Gov. Kohn and I are still in the office . . . Based on [Bear Stearns] global operations, do you know if anyone has talked with the [Financial Services Authority] in London? [REDACTED MATERIAL] We have pulled together the exposure #s of the [Large Financial Institutions] to [Bear Stearns] but the information is from the last monthly reports."  The *Vaughn* index describes the withheld material as "five sentences" that "describe[] a conversation between Scott Alvarez, General Counsel to the Board, and a member of Board staff, regarding the projected regulatory response to BS's funding  position, and a Board staff member's subsequent contact with another federal agency concerning the situation at BS."

[11]Item No. 20 is an email from a Board official on March 14, 2008, at 5:48 a.m. that states:  "I just got off a call with folks at [the FRBNY].  Below is a chart with exposures. I'm on my way into the office."  The *Vaughn* index describes the withheld material as a "table," that "identifies BS's projected cash flows, as well as FRS-supervised LFIs with exposure to BS and the relative size of the exposure to the institution in question."

[12]Plaintiff also refers to Item 19, but item 19 is simply the redaction of a personal cell phone number.  The attachment to the e-mail – the spreadsheet showing Bear Stearns "exposure" – is the document (Item #20; Bates # 00041) that is withheld.

they "reveal[] the identities of institutions that FRS staff considered to be systemically important or whose failure could have systemic consequences to the financial system . . . ." (Thro Decl., Ex. F, Item 8.) As explained by the Board:

> "In other words, there were certain financial institutions whose failure (possibly prompted by a Bear Stearns bankruptcy) the Board believed could have ripple effects across the financial system at large. The possible impact of a Bear Stearns bankruptcy on these institutions played an important part in the Board's deliberations leading to its decision to authorize the Temporary Loan, see Stefansson Decl., ¶ 8, and revealing their names would be tantamount to revealing the Board's decision making process."

(Def.'s Opp'n & Reply at 11.) In support of its argument, the Board cites two cases: *Quarles v. Dep't of the Navy*, 893 F.2d 390 (D.C. Cir. 1990), and *Montrose Chemical Corp. v. Train*, 491 F.2d 63 (D.C. Cir. 1974.) In *Quarles*, the court upheld the withholding of certain cost estimates made by agency officials because the estimates themselves reflected the exercise of the agency's judgment. In *Montrose*, the court upheld the withholding of factual summaries made by an agency official based on evidence entered into the lengthy record of a public hearing. Plaintiff contends that the present case "differs substantially" from *Quarles* and *Montrose* because all that he seeks released is "raw market data." The Court disagrees.

Having reviewed the Items plaintiff identifies as improperly withheld and the entire record, the Court is persuaded that defendant has adequately established that disclosing the withheld factual material would reveal the Board's deliberative process. In *Montrose*, the court observed that "[t]he work of the assistants in separating the wheat from the chaff is surely just as much part of the deliberative process as is the later milling by running the grist through the mind of the administrator." *Montrose*, 491 F.2d at 71. Similarly here, as defendant puts it, "[t]he work of Board and FRBNY staff in reaching out and culling certain financial statistics and

exposure data, and the identities of certain financial institutions, for consideration by the Board from the mass of data available to it is itself deliberative." (Def.'s Opp'n & Reply at 11.) For example, the Thro declaration describes Item #13, among others, as a document "conveying or discussing data gathered by Reserve Bank examiners concerning supervised financial institutions and their exposure to Bear Stearns" and declaring that the "information was gathered for and communicated to and discussed by Board members and Board and Reserve Bank staff in connection with the Board's decision . . . because it bore on the significant issue of the potential consequences of a Bear Steans bankruptcy on individual financial institutions and firms and then-fragile financial markets." (Thro Decl. ¶ 17.) Items #16 and #20, among others, are described as e-mails "conveying market developments and analyses related to a potential bankruptcy by Bear Stearns; methods of obtaining information regarding financial insitutions' exposure to Bear Stearns; proposed regulatory responses to the situation; and arguments and considerations regarding the need for the Temporary Loan" and that "this information and these analyses were considered by the Board and staff advising the Board as part of the ongoing process of deliberation." Accordingly, the Court is "convinced" that disclosure of the requested "factual summar[y] prepared [for] decisionmakers" "'would expose [the Board's] decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions.'" *Quarles*, 893 F.2d at 392 (quoting *Dudman*, 815 F.2d at 1568).

## 2.      Harm to Decision-Making Process

Plaintiff also argues that defendant has failed to establish the applicability of the deliberative process privilege because defendant has not demonstrated "that disclosure of the

withheld records or information would cause harm to its decision-making process." (Pl. Mem. & Opp'n at 30.) However, once it has been shown that a document is both predecisional and deliberative, no such showing is legally required.

Plaintiff bases his argument on the following language from *Mead Data*, 566 F.2d at 258: "An agency cannot meet its statutory burden of justification by conclusory allegations of possible harm. It must show by specific and detailed proof that disclosure would defeat, rather than further, the purposes of FOIA." Plaintiff fails to acknowledge, however, that the court in *Mead Data* made this statement in considering whether Exemption 5 could ever apply to an agency's negotiation proceedings with an outside party – i.e. to material that was indisputably not part of the agency's internal deliberative process. *Id.* at 257-58. The court held that in order for Exemption 5 to apply, the agency would have to show "that the threat of disclosure of negotiation proceedings would so inhibit private parties from dealing with the Government that agencies must be permitted to withhold such information in order to preserve their ability to effectively arrange for contractual agreement." *Id.* It was only in this context that the court suggested that "more than conclusory allegations of possible harm" were required. *Id.* In contrast, in that same decision, the court upheld the applicability of Exemption 5 to other documents where the record established that those documents were both "predecisional" and "part of the deliberative process." *Id.*

Here, defendant has both "establish[ed] what deliberative process is involved, and the role played by the documents in issue in the course of that process." *See Coastal States*, 617 F.2d at 868 (D.C. Cir. 1980.) Having established that the withheld documents were both "predecisional" and "deliberative," defendant is not also required to establish that the release of

the withheld documents or material would cause "harm" to the decision-making process.

### C.  Applicability of Attorney Work Product Privilege

The Board has withheld Item 38 based on the attorney work product component of Exemption 5.  "The work-product doctrine shields materials 'prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent).'"  *Judicial Watch, Inc. v. Dep't of Justice*, 432 F.3d 366, 371 (D.C. Cir. 2005) (quoting Fed. R. Civ. P. 26(b)(3)) Tax Analysts v. IRS, 117 F.3d 607, 620 (D.C.Cir. 1997).  "The purpose of the privilege, however, is not to protect any interest of the attorney, who is no more entitled to privacy or protection than any other person, but to protect the adversary trial process itself."  *Coastal States*, 617 F.2d at 864.  While there is no requirement that actual litigation be pending, "at the very least some articulable claim, likely to lead to litigation, must have arisen."  *Id.*  "[T]he Supreme Court has made clear [that] the doctrine should be interpreted broadly and held largely inviolate."  *Judicial Watch*, 432 F.3d at 371 (citing *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947)).  Thus, "[a]ny part of [a document] prepared in anticipation of litigation, not just the portions concerning opinions, legal theories, and the like, is protected by the work product doctrine and falls under exemption 5."  *Id.* at 371 (quoting *Tax Analysts*, 117 F.3d at 620).  "In other words, factual material is itself privileged when it appears within documents that are attorney work product.   If a document is fully protected as work product, then segregability is not required."  *Id.*

The document withheld by the Board as attorney work product is a "draft affidavit . . . conveyed by a FRBNY attorney to Board attorneys."  (*Vaughn* Index at 39; *see also* Thro Decl. ¶

22.)  According to defendant, the affidavit was "prepared by FRBNY attorneys in anticipation of litigation by Bear Stearns shareholders related to the Board's authorization to extend credit to [Bear Stearns] indirectly through [JP Morgan Chase]."  (*Id.*)

Plaintiff first argues that as the document was prepared by an FRBNY attorney, it is not the work product of the Board's attorney.  However, as discussed above, because FRBNY personnel were acting as consultants to the Board, the work product of an FRBNY attorney conveyed to the Board is properly withheld under Exemption 5.  *Cf. National Institute of Military Justice*, 512 F.3d at 684-85 & n.10 (Exemption 5 applies to communications between an agency and "individual non-government lawyers" pursuant to the "consultant corollary" principle); *see also Hanson v. U.S. Agency for Intern. Development*, 372 F.3d 286, 294 (4th Cir. 2004) ("The government has the same right to undisclosed legal advice in anticipation of litigation as any private party.  And there is nothing in FOIA that prevents the government from drawing confidential counsel from the private sector.  Allowing disclosure here would impair an agency's ability to prepare effectively for litigation with private parties and thereby thwart its ability to discharge its functions in the public interest.")

Plaintiff's second argument is that the Board has not met its burden to show that there was "some articulable claim, likely to lead to litigation."  (Pl's. Mem. & Opp'n at 31 (quoting *Coastal States*, 617 F.2d at 865).)  The Court disagrees.  The Thro Declaration describes the withheld document as an affidavit "setting out the factual considerations and legal analyses" that had been "presented orally to the Board prior to its decision" and prepared due to the Board's concern about "possible litigation stemming from the Board's decision."  (Thro Decl. ¶ 22.)  Moreover, the Board has submitted affidavits establishing that "stockholders of Bear Stearns had

filed several lawsuits in March 2008 in the Delaware Court of Chancery and in the Supreme

Court of the State of New York seeking to enjoin JP Morgan, Chase & Co.'s merger with Bear

Stearns." (Def.'s Reply at 16.) Indeed, as the Board points out, "the brief from the Delaware

Chancery litigation provided to the Plaintiff specifically mentions 'critical actions by the Federal

Reserve Bank of New York' that led to the merger. (*Id.* (internal quotations omitted).)

Accordingly, the Court is convinced that "it was entirely reasonable for the Board to anticipate

that it, and/or the FRBNY, might be drawn into litigation by Bear Stearns shareholders, and to

prepare for the possibility of litigation." (*Id.*)

## III.    FOIA Exemption 8

In addition to FOIA Exemption 5, defendant relies on FOIA Exemption 8 as a alternate

basis for withholding thirteen Items (Item #'s 4, 5, 6, 9, 10, 11, 12, 13, 17, 18, 21, and 22).

FOIA Exemption 8 provides that an agency may withhold information that is "contained in or

*related to* the *examination, operating or condition reports* prepared by, or on behalf of, or for the

use of an agency responsible for the regulation or supervision of financial institutions."  5 U.S.C.

§ 552(b)(8).  The Board cites Exemption 8 in declining to produce e-mails or tables (or portions

thereof) that contained information furnished to the Board by financial institutions regulated by

the Board.  (Thro Decl. ¶17; Stefansson Decl. ¶¶  2, 4, 13-15.)  Specifically, the Board withheld

the identity of institutions with exposure to Bear Stearns, the amount of such exposure, and/or

the activities these institutions had taken to limit their exposure to Bear Stearns.  (See Thro Decl.

¶ 17; Steffanson Decl. ¶ 15.)  Similarly, the Board withheld under Exemption 8 information the

SEC gathered from Bear Stearns "in connection with its supervision and regulation of Bear

Stearns." (Winter Decl. ¶ 9; *see also* Thro Decl.¶¶ 10, 11, 18.)  Plaintiff challenges all of

defendant's Exemption 8 withholdings.

FOIA Exemption 8 serves two purposes: (1) to ensure the security of financial institutions by eliminating the risk that disclosure of examination, operation, and condition reports containing frank evaluations of the investigated banks that might undermine public confidence and cause unwarranted runs on banks; and (2) to safeguard the relationship between the banks and their supervising agencies because if details of the bank examinations were made freely available to the public and to banking competitors, banks would cooperate less than fully with federal authorities.  *See Public Citizen v. Farm Credit Admin.*, 938 F.2d 290, 291 (D.C. Cir. 1991); *Consumers Union of U.S., Inc. v. Heimann*, 589 F.2d 531, 534 (D.C. Cir. 1978); *see also Nat'l Cmty. Reinv. Coal. v. Nat'l Credit Union Admin.*, 290 F. Supp. 2d 124, 135-36 (D.D.C. 2003)

 Although generally FOIA exemptions are to be "narrowly construed," *U.S. Dep't of Justice v. Julian*, 486 U.S. 1, 8 (1988); *Wolf*, 473 F.3d at 374, it is well-established that Exemption 8's scope is "particularly broad."  *Consumers Union*, 589 F.2d at 534.  In *Consumers Union*, the D.C. Circuit  considered FOIA Exemption 8 for the first time and concluded that "[i]f the Congress has intentionally and unambiguously crafted a particularly broad, all-inclusive definition, it is not our function, even in the FOIA context, to subvert that effort."  *Id.* Subsequent decisions have reaffirmed that Exemption 8 "provide[s] absolute protection regardless of the circumstances underlying the regulatory agency's receipt or preparation of examination, operating or condition reports."  *Gregory v. Fed. Deposit Ins. Corp.*, 631 F.2d 896, 898 (D.C. Cir. 1980).

Plaintiff acknowledges that Exemption 8 was "crafted broadly," but argues that the Board

has not met its obligation to provide "'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'"  (Pl.'s Mem. at 32 (quoting *King v. U.S. Dep't of Justice*, 830 F.2d 210, 219 (D.C. Cir. 1987).)  Specifically, plaintiff faults the Board for not identifying the specific "report" to which the information relates.[13]

The Board's affidavits establish that the Board's bank supervisory process "is one of continual interaction and information-sharing by regulated entities with their bank supervisors" (Stefansson Decl. ¶ 15); that the withheld materials "constituted part of a fast moving, real-time effort by the Board to monitor the possible impact of a Bear Stearns bankruptcy filing on financial institutions regulated by the Board" (Stefansson Decl. ¶¶ 4-5, 15;  Thro Decl. ¶ 17); that "Federal Reserve examiners utilizing the Board's supervision authority obtained information from various LCBOs regarding their exposure to Bear Stearns in an effort to gauge possible impact of a Bear Stearns bankruptcy on regulated financial institutions" (Stefansson Decl. ¶14); that the information was provided based on strict assurances of confidentiality (Stefansson Decl. ¶¶ 14-15; Thro Decl. ¶ 17); and that the Board created or obtained these documents as part of its "continuous" supervision of institutions it supervised, in the hectic days and hours during which the Board and its staff strove to assess the impact of a possible disorderly failure of Bear Stearns. (Stefansson Decl. ¶¶ 4-8, 15; Thro Decl. ¶ 17.)  Similarly, the affidavits establish that Bear

_____

[13]It is true, as plaintiff points out, that the *Vaughn* index  makes no mention of examination, operating, or condition reports with respect to its reasons for withholding Item #'s 4, 5, 6, 9, 10, 13, 17, 18, 21, 22, and 24.  However, defendant remedies this omission in its affidavits.

Stearns was supervised by the SEC as part of its CSE[14] program, which "was designed to monitor for financial or operational weakness in a CSE holding company or its unregulated affiliates that might place the U.S.-regulated broker-dealers and other regulated entities at risk" (Winter Decl. ¶10); and that the SEC obtained the withheld information in connection with its supervision and regulation of Bear Stearns (Danis Decl. ¶¶ 4-5; *see also Vaughn* Index at 11-12 (Items 10 and 11).)

Under these circumstances, and given the Board's statutory authority to "require such statements or reports as it may deem necessary," 12 U.S.C. § 248(a), the Board contends that the information it was receiving in "real-time" about what financial significance a Bear Stearns failure would have for a given institution and financial markets more generally is properly characterized as related to "examination, operating, or condition" reports about individual supervised institutions.  (*See* Stefansson Decl. ¶ 8.)  The Court agrees.  Given the breadth of Exemption 8, and the Board's and the SEC's undisputed regulatory responsibilities in relation to the financial institutions whose information has been withheld, these affidavits are sufficient to establish that the Board properly withheld the above-described information as "*related to* the *examination, operating or condition reports* prepared by, or on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions." 5 U.S.C. § 552(b)(8); *see also Teichgraeber v. Board of Governors of the Federal Reserve System*, 1989 WL 32183 (D. Kan. 1989) ("Because plaintiff has not controverted defendant's assertion that the documents are directly based upon examination and investigation reports, the court must give

---

[14]The CSE program "allowed the [SEC] to supervise certain broker-dealer holding companies, including Bear Stearns, on a consolidated basis."  (Winter Decl. ¶ 10.)

effect to the plain meaning of Exemption 8 and grant defendant's motion.")

Plaintiff's contention that "Congress cannot have intended the term 'report' as used in Exemption 8 to have such an overarching meaning" is made without citation to any authority. Indeed, plaintiff's position is undermined by the fact that it is well-established that Exemption 8 is to be broadly construed. *See*, *e.g.*, *Consumers Union*, 589 F.2d at 534; *Gregory*, 631 F.2d at 898. Moreover, plaintiff's suggested limitation on the scope of Exemption 8 would lead to an outcome that is inconsistent with the one of the two purposes of Exemption 8 – to ensure "frank cooperation between bank officials and regulated entities." *Gregory*, 631 F.2d at 899; *see also Consumers Union*, 589 F.2d at 534 (second purpose is "to safeguard the relationship between the banks and their supervising agencies"); *Nat'l Cmty. Reinv. Coal.*, 290 F. Supp. 2d at 135-36 (one purpose of Exemption 8 is to "to ensure that [banks] continue to cooperate . . . without fear that their confidential information will be disclosed.") As the court in *Consumers Union* observed, "[i]f details of the bank examinations were made freely available to the public and to banking competitors, . . . banks would cooperate less than fully with federal authorities." *Consumers Union*, 589 F.2d at 534. Based on its examination of the record, the Court agrees that the Board's "ability to gather such information in furtherance of its mission to regulate our nation's banking system would inarguably be compromised if such information were now released." (Def.'s Mem. at 26.) As that outcome is precisely what Exemption 8 is designed to avoid, the Court is persuaded that the Board properly withheld documents under Exemption 8.

## IV.   REMAINING ISSUES

In addition to its more general arguments, plaintiff also challenges the withholding of specific records. In a number of instances, plaintiff's points simply restate arguments addressed

above.  As for the remaining arguments, the Court has reviewed the record and finds no merit to plaintiff's arguments.  In addition, having concluded that the Board properly claimed both FOIA Exemptions 5 and 8, the Court need not address whether Exemption 4 also justified withholding certain Items.

Finally, the Court has an affirmative obligation to address the issue of segregability *sua sponte*.  *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999).  FOIA requires that an agency produce "any reasonably segregable portion" of a record that is not exempt from disclosure.  5 U.S.C. § 552(b).  According to the Thro Declaration, she, "working with at least two other attorneys in the Board's Legal Division, . . . reviewed the responsive documents for potentially exempt information."  (Thro Decl. ¶ 14.)  She avers that "[e]ach page was carefully reviewed, and the redactions were highly circumscribed" and that "[p]ages were withheld in full only when they contained no reasonably segregable nonexempt material."  (*Id.*)  The *Vaughn* index provides detailed descriptions of each document and portions that are withheld either in part or in whole.  The Court has reviewed the *Vaughn* index and is satisfied that defendant has produced all reasonably segregable nonexempt material.

## CONCLUSION

Having considered the pleadings and the entire record herein, and for the foregoing reasons, the Court concludes that the Board properly withheld documents pursuant to FOIA Exemptions 5 and 8.  Accordingly, an accompanying Order grants defendant's motion for summary judgment and denies plaintiff's cross-motion.


_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

DATE: September 29, 2010